## Richard WOLFSON and Nancy Wolfson

v.

## Paul LEWIS, Stephen Wilson, Jane Doe and John Doe.

### Civil Action No. 96–1162.

United States District Court,
E.D. Pennsylvania.

April 8, 1996.

John M. Elliott, James C. Crumlish, III, Mark J. Schwemler, Frederick P. Santarelli, Gerald Lawrence, Jr., Elliott Reihner Siedzikowski & Egan, P.C., Blue Bell, PA, for plaintiffs.

Robert N. Spinelli, Kelley, Jasons, McGuire & Spinelli, Philadelphia, PA, Dean Ringel, Cahill, Gordon & Reindel, New York City, for defendants.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

In this diversity action, plaintiffs seek to enjoin the activities of defendants, two broadcast journalists preparing an expose on the high salaries being paid to executives of U.S. Healthcare for an upcoming episode of the syndicated daily television news program *Inside Edition*. Plaintiffs, a couple who live with their children in the residential community of Gwynedd Valley, Pennsylvania, claim that defendants invaded their rights of privacy.

Nancy Wolfson is the director of the health education department at U.S. Healthcare and her husband, Richard Wolfson, is the director of the pharmacy and dental operations at U.S. Healthcare. Mrs. Wolfson is the daughter and Mr. Wolfson the son-in-law of U.S. Healthcare's chairman of the board and principal executive officer Leonard Abramson. Defendants contend that they did not invade plaintiffs' privacy and that their conduct investigating the salaries of U.S. Healthcare executives is protected by the First Amendment to the United States Constitution. This Court must determine whether defendants invaded plaintiffs' privacy.

Plaintiffs filed their complaint on February 14, 1996 in the Montgomery County Court of Common Pleas, and defendants removed the action to this Court on February 15, 1996. Plaintiffs' complaint alleges that the defendants engaged in "tortious stalking, harassment, trespass, intrusions upon seclusion and invasions of privacy." Plaintiffs requested that the Court enter a "temporary restraining order and after a hearing a preliminary and permanent injunction against the Defendants' ongoing stalking, harassment, trespass, and invasions of privacy, including De-

fendants' stalking of Plaintiffs, their three year old child, their families, business and social associates." Defendants deny that they engaged in "tortious stalking, harassment, trespass, intrusions upon seclusion and invasions of privacy" of the plaintiffs during the investigation of the story on U.S. Healthcare.

A hearing was held between February 27, 1996 and March 9, 1996 regarding plaintiffs' request for injunctive relief. Pursuant to Federal Rule Civil Procedure 15(b), the Court permitted testimony at the hearing concerning defendants' conduct in Florida on the weekend of February 17, 1996.

This memorandum contains this Court's findings of fact and conclusions of law in connection with plaintiffs' equitable action seeking injunctive relief.

## I. Legal Background

Before setting forth the Court's findings of fact and conclusions of law, the Court will discuss the legal framework it will apply to its determination of whether defendants invaded plaintiffs' privacy rights.

### A. Freedom of the Press and the Right to Privacy

The First Amendment of the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech, or of the press." When the First Amendment became part of the Constitution more than two hundred years ago, its drafters could not have imagined the existence of a television in most homes and the sophisticated tools available to T.V. journalists. T.V. journalists have at their disposal cameras with powerful zoom lenses, video camcorders that simultaneously record pictures and sound, directional microphones with the capacity to pick up sound sixty yards away, and miniature cameras and recording devices easily hidden in a pocket or behind a tie.

Although some may contend that judges should discern exactly what the framers of the constitution intended in order to resolve the issues before them, this Court agrees with Justice Brennan's view that "[t]hose who would restrict claims of right to the values of 1787 specifically articulated in the Constitution turn a blind eye to social progress ..." Television has become this nation's most powerful media. There is no question that T.V. journalists are protected by the First Amendment.

The First Amendment guarantee of a free press has a long and rich history in the United States. It is a cornerstone of liberty and "basic to the existence of constitutional democracy." *Grosjean v. American Press Co.,* 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936). A vigorous press, even a "cantankerous press, an obstinate press, [and] an ubiquitous press" guarantees the flow of information and opinions to the public. *United States v. New York Times Co.,* 328 F.Supp. 324, 331 (S.D.N.Y.), rev'd, 444 F.2d 544 (2d Cir.1971) (en banc), rev'd, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam). The United States Supreme Court has observed that the First Amendment serves a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open", *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964), and that the press has been a "mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences...." *Estes v. Texas,* 381 U.S. 532, 539, 85 S.Ct. 1628, 1631, 14 L.Ed.2d 543 (1965). First Amendment protections extend to "all issues about which information is needed or appropriate to enable members of the society to cope with the exigencies of their period." *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 147, 87 S.Ct. 1975, 1987, 18 L.Ed.2d 1094 (1967) (citations omitted).

The values underlying the First Amendment might well be served by a story about the compensations paid to executives at health maintenance organizations ("HMOs") such as U.S. Healthcare. The press has the right to inform the public about the organizations that provide health insurance to millions of Americans. As of December 1994, U.S. Healthcare had about two million members.

■ At the core of the First Amendment is the right to publish or broadcast the news without prior restraint. *See, e.g., Near v. State of Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *Grosjean,* 297 U.S. at 249, 56 S.Ct. at 449; *CBS Inc. v. Davis,* —— U.S. ——, 114 S.Ct. 912, 127 L.Ed.2d 358 (1994). Implicit in the right to publish the news is the right to gather the news. "Without some protection for seeking the news, freedom of the press could be eviscerated." *Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972). There is an "undoubted right to gather news 'from any source by means within the law....'" *Houchins v. KQED, Inc.,* 438 U.S. 1, 11, 98 S.Ct. 2588, 2594, 57 L.Ed.2d 553 (1978) (citations omitted). Because a "free press cannot be made to rely solely upon the sufferance of government to supply it with information," the First Amendment protects the right of journalists to lawfully obtain information using "routine newspaper reporting techniques." *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 103, 99 S.Ct. 2667, 2671, 61 L.Ed.2d 399 (1979).

The issue posed by this case is, therefore, the extent to which the First Amendment protects newsgathering by T.V. journalists using modern technologies.

■ James Madison declared in 1798: "Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press." Like other first amendment rights, however, the right to gather the news is not absolute. *Zemel v. Rusk,* 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965) (noting in dicta that the "right to speak and publish does not carry with it the unrestrained right to gather information."). As the United States Supreme Court pointed out in *Branzburg,* the "First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." The *Branzburg* Court also emphasized that the press has no "special immunity from the application of general laws", nor does it have a "special privilege to invade the rights and liberties of others." *Branzburg,* 408 U.S. at 683, 92 S.Ct. at 2657. In *Cohen v. Cowles Media Co.,* 501 U.S. 663, 668–669, 111 S.Ct. 2513, 2518, 115 L.Ed.2d 586 (1991), the Supreme Court held that the First Amendment does not prohibit a plaintiff from recovering damages for a newspaper's breach of a promise of confidentiality. The Supreme Court stated:

> generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news ... The press may not with impunity break and enter an office or dwelling to gather the news.

*Id.* at 669, 111 S.Ct. at 2518.

■ The First Amendment does not, therefore, shield the press from torts and crimes committed in the pursuit of a story. In *Galella v. Onassis,* 353 F.Supp. 196 (S.D.N.Y.1972), *aff'd in part and rev'd in part,* 487 F.2d 986 (2d Cir.1973), the District Court found Galella, a freelance photographer known as a "paparazzo", guilty of harassment, intentional infliction of emotional distress, assault and battery, commercial exploitation of defendant's personality, and invasion of privacy for his conduct photographing Mrs. Onassis and her children. The Court concluded that the First Amendment "does not immunize all conduct designed to gather information about or photographs of a public figure ... and that there is no constitutional right to assault, harass, or unceasingly shadow or distress public figures." *Galella,* 353 F.Supp. at 223. On review, the Second Circuit narrowed the scope of the permanent injunction entered by the District Court but flatly rejected Galella's contention that the First Amendment is a wall of immunity protecting the media from any liability for their conduct. The Second Circuit concluded: "Crimes and torts committed in news gathering are not protected" and that "[t]here is no threat to a free press in requiring its agents to act within the law." *Galella,* 487 F.2d at 995–996. In *A.A. Dietemann v. Time, Inc.,* 449 F.2d 245, 249 (9th Cir. 1971), the Ninth Circuit, rejecting the contention that the First Amendment immunized the media from liability for gathering information from plaintiff's home using hidden cameras and electronic devices, stated:

The First Amendment has never been construed to accord newsmen immunity from torts or crimes committed during the course of newsgathering. The First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office. It does not become such a license simply because the person subjected to the intrusion is reasonably suspected of committing a crime.

*Id.*

As both *Galella* and *Dietemann* illustrate, First Amendment freedoms can at times collide with another important cornerstone of democratic society—the right to privacy. The use of sophisticated video and recording equipment by T.V. journalists has increased the threat that a person's right to privacy may be violated. Furthermore, the television market for scandal and sensationalism has encouraged T.V. journalists to engage in forms of newsgathering that may bring about a clash between the right to privacy and freedom of the press. Recognizing this potential clash between privacy and the First Amendment, this Court must proceed with caution in making its determination as to whether the plaintiffs' privacy rights were invaded under the facts of this case.

The U.S. Constitution is one source of a right to privacy, despite the absence of the word "privacy" in the text of the Constitution. The Fourth Amendment's search and seizure clause has been characterized as a privacy provision. *See, e.g., Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). The Supreme Court in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), recognized the right of privacy in the "penumbras" of the First, Third, Fourth, Fifth and Ninth Amendments. In considering the constitutionality of ordinances regulating the time, place and manner of speech, the Supreme Court has recognized the competing values of freedom of expression and an individual's right to privacy. *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); *see also Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). In *Carey,* the United States Supreme Court underscored that the state's interest in "protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." *Carey,* 447 U.S. at 471, 100 S.Ct. at 2296. Quoting from *Gregory v. Chicago,* 394 U.S. 111, 125, 89 S.Ct. 946, 953, 22 L.Ed.2d 134 (1969), the Supreme Court in *Carey* further stated:

Preserving the sanctity of the home, the one retreat to which men and women can repair to escape the tribulations of their daily pursuits, is surely an important value. Our decisions reflect no lack of solicitude for the right of an individual 'to be let alone' in the privacy of the home, 'sometimes the last citadel of the tired, the weary, and the sick.'

*Id.* at 472, 100 S.Ct. at 2295.

Specifically at issue in this case is whether the defendants violated plaintiffs' right to privacy under Pennsylvania and Florida law. The tort of invasion of privacy was originally conceptualized by Samuel D. Warren and Louis D. Brandeis in their seminal law review article entitled "The Right to Privacy", 4 Harv.L.Rev. 193 (1890). Warren and Brandeis characterized the right of privacy as "the right to be let alone", and they advanced two major threats to privacy. *Id.* at 195. One threat was the press, which they viewed as "overstepping in every direction the obvious bounds of propriety and of decency." *Id.* at 196. The second threat was the advent of "numerous mechanical devices" which "threaten[ed] to make good the prediction that 'what is whispered in the closet shall be proclaimed from the house-tops.'" *Id.* at 195.

The next major advancement in the development of the tort of invasion of privacy occurred seventy years later when William L. Prosser published his law review article "Privacy." 48 Cal.L.Rev. 383 (1960). Prosser asserted that privacy was comprised of four distinct torts: (1) intrusion upon seclusion or solitude; (2) public disclosure of private facts; (3) publicity which places the plaintiff in a false light; and (4) appropriation of name or likeness. *Id.* at 389. These four torts were later adopted by the Restatement (Second) of Torts in sections 652B–652E.

Plaintiffs' invasion of privacy claim in this case is based solely on the tort of intrusion upon seclusion under state law.

### B. Invasion of Privacy: Pennsylvania and Florida Law

In Pennsylvania a violation of the right to privacy is an actionable tort. *Harris v. Easton Pub. Co.*, 335 Pa.Super. 141, 483 A.2d 1377, 1383 (1984). In an early Pennsylvania invasion of privacy case, *Bennett v. Norban*, 396 Pa. 94, 151 A.2d 476, 479 (1959), the Supreme Court of Pennsylvania explained that "[t]he gist of privacy is the sense of seclusion, the wish to be left alone, and it is a trespass to abuse these personal sensibilities." In *Bennett*, plaintiff was accosted on the public street by an assistant manager of a shop who erroneously suspected her of shoplifting. He ordered her to take off her coat, reached into the pockets of her dress, and searched through her purse. The Court found that the tort of invasion of privacy redressed the "sense of personal outrage to which [plaintiff] was subjected" and that the "angry performance of defendant's agent was an unreasonable and serious interference with appellant's desire for anonymity and an intrusion beyond the limits of decency." *Id.* at 479. In a variety of contexts, moreover, Pennsylvania courts have consistently expressed their commitment to an individual's right to privacy. *See, e.g., Commonwealth v. Matos*, 672 A.2d 769 (Pa.1996); *In Re B*, 482 Pa. 471, 394 A.2d 419 (1978); *see also, Commonwealth v. McIvor*, 670 A.2d 697 (Pa.Super.1996); *Klebanoff v. McMonagle*, 380 Pa.Super. 545, 552 A.2d 677 (1988), *alloc. den.*, 522 Pa. 620, 563 A.2d 888 (1989).

■ Pennsylvania has adopted the tort of intrusion upon seclusion as set forth at § 652B of the Restatement (Second) of Torts. *See Vogel v. W.T. Grant Co.*, 458 Pa. 124, 327 A.2d 133 (1974). Section 652B of the Restatement (Second) of Torts defines intrusion upon seclusion as follows:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion

would be highly offensive to a reasonable person.

Florida also recognizes the tort of invasion of privacy based on intrusion upon seclusion. *See, e.g., Cason v. Baskin, et al.*, 155 Fla. 198, 20 So.2d 243 (1944) (originally adopting the tort of invasion of privacy in Florida); *Guin v. City of Riviera Beach*, 388 So.2d 604, 606 (Fla.Dist.Ct.App. 4th 1980) (recognizing that the tort of invasion of privacy is ordinarily considered to encompass four categories, one of which consists of "intrusion upon the plaintiff's physical solitude or seclusion, as by invading his home."); *Tucker v. American Employers' Ins. Co.*, 171 So.2d 437, 438 (Fla. Dist.Ct.App. 2nd 1965). The Court notes the parties do not dispute the application of Pennsylvania and Florida law to the facts of this case.

■ An actionable intrusion upon seclusion consists of "an intentional interference with [a person's] interest in solitude or seclusion, either as to his person or his private affairs or concerns...." Restatement (Second) of Torts § 652B, comment a. As stated in comment b of § 652B, the interference may be,

> by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home. It may also be by the use of the defendant's sense, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or taping his telephone wires.

This tort generally does not apply to matters which occur in a public place or a place otherwise open to the public eye. Comment c to § 652B illustrates this point:

> The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs. Thus there is no liability for the examination of a public record concerning the plaintiff, or of documents that the plaintiff is required to keep and make available for public inspection. Nor is

there liability for observing him or even taking his photograph, while he is walking on the public highway, since he is not then in seclusion, and his appearance is public and open to the public eye. Even in a public place, however, there may be some matters about the plaintiff, such as his underwear or the lack of it, that are not exhibited to the public gaze; and there may still be invasion of privacy when there is intrusion upon these matters.

Comment c underscores the traditional rule that watching or observing a person in a public place, or taking a photograph of a person who can be observed from a public vantage point, is not generally an invasion of privacy. *See, e.g., Wehling v. Columbia Broadcasting System,* 721 F.2d 506, 509 (5th Cir.1983) (broadcasting a picture of plaintiff's residence which showed nothing more than what could be seen from a public street is not an invasion of privacy); *Dempsey v. The National Enquirer,* 702 F.Supp. 927, 931 (D.Me.1988) (a reporter's presence on a public thoroughfare and in a restaurant open to the public cannot constitute an intrusion upon seclusion of another); *Machleder v. Diaz,* 538 F.Supp. 1364, 1374 (S.D.N.Y.1982) (no liability for intrusion upon seclusion when defendant accosted and filmed plaintiff on the property of a corporation, a "semi-public" place, where he was visible to the public eye).

▪ Conduct that amounts to a persistent course of hounding, harassment and unreasonable surveillance, even if conducted in a public or semi-public place, may nevertheless rise to the level of invasion of privacy based on intrusion upon seclusion. *See, e.g., Galella.* The Restatement recognizes that conduct that is repeated with such persistence and frequency as to amount to a "course of hounding the plaintiff, [and] becomes a substantial burden to his existence" may constitute an invasion of privacy. § 652B, comment d. Pennsylvania courts, moreover, have specifically refused to recognize a separate tort of harassment on the ground that "an action for invasion of privacy will ordinarily be an adequate remedy for highly offensive conduct which unreasonably interferes with another's right to be left alone." *DeAngelo v. Fortney,* 357 Pa.Super. 127, 515 A.2d 594, 596 (1986); *Speight v. Personnel*

*Pool of America, Inc.,* 1993 W.L. 276859 at 4–5 (E.D.Pa. July 20, 1993) (Padova, J.) (repeated harassment that amounts to hounding and becomes a substantial burden to a plaintiff may be an intrusion upon seclusion). Other courts including Florida also recognize this general principle. *See, e.g., Tucker v. American Employers' Insurance,* 171 So.2d 437 (Fla.Dist.Ct.Ap. 2nd 1965) (genuine issue of material fact existed as to whether defendant's shadowing of plaintiff constituted invasion of privacy); *Summers v. Bailey,* 55 F.3d 1564, 1567 (11th Cir.1995) (conduct constituting offensive, frightening and unreasonable surveillance of plaintiff's private affairs supports cause of action for intrusion into seclusion); *Phillips v. Smalley Maintenance Services, Inc.,* 711 F.2d 1524, 1536–1537 (11th Cir.1983) (noting that offensive and coercive sexual demands that interfered with plaintiff's "emotional sanctum" actionable invasion of privacy regardless of where the conduct occurred); *Pinkerton Nat'l Detective Agency v. Stevens et. al.,* 108 Ga.App. 159, 132 S.E.2d 119 (1963) (defendants' conduct shadowing plaintiff in a manner designed to frighten her and which caused mental and emotional suffering sufficiently alleged invasion of privacy.).

▪ In Pennsylvania there is no liability for intrusion upon seclusion "unless the interference with the plaintiff's seclusion is a substantial one, of a kind that would be offensive to the ordinary reasonable [person], as the result of conduct to which the reasonable [person] would strongly object." Restatement (Second) of Torts § 652B, comment d; *see also, Chicarella v. Passant,* 343 Pa.Super. 330, 494 A.2d 1109, 1114 (1985) (holding that intrusion must be substantial and highly offensive to ordinary person). A tortious invasion of privacy must " 'cause mental suffering, shame or humiliation to a person of ordinary sensibilities.' " *DeAngelo v. Fortney,* 515 A.2d at 595 (quoting *Hull v. Curtis Publishing Co.,* 182 Pa.Super. 86, 125 A.2d 644, 646 (1956)).

▪ Likewise, in Florida, the intrusion must be substantial. In *Cason* the Florida Supreme Court noted:

The right of privacy is relative to the customs of the time and place, and it is determined by the norm of the ordinary man. The protection afforded by the law to the right must be restricted to 'ordinary sensibilities,' and cannot extend to supersensitiveness or agoraphobia. In order to constitute an invasion of privacy, an act must be of such a nature as a reasonable man can see might and probably would cause mental distress and injury to anyone possessed of ordinary feelings and intelligence, situated in like circumstances as the complainant.

20 So.2d at 251 (citations omitted). *See also, Harms v. Miami Daily News, Inc.,* 127 So.2d 715, 717 (Fla.Dist.Ct.App. 3rd 1961) (observing that the "standard by which the right [of privacy] is measured is based upon a concept of the man of reasonable sensibility; the hypersensitive individual will not be protected.").

 In determining whether an invasion of a privacy interest would be "offensive" to an ordinary, reasonable person, a court should consider all of the circumstances including "the degree of the intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." *Hill v. National Collegiate Athletic Assoc.,* 7 Cal.4th 1, 26 Cal.Rptr.2d 834, 865 P.2d 633, 648 (1994).

Finally, the intrusion upon seclusion must be intentional. The Third Circuit has stated that an actor commits an *intentional* intrusion, "only if he/[she] believes, or is substantially certain, that he/[she] lacks the necessary legal or personal permission to commit the intrusive act ... [T]he intrusion, as well as the action, must be intentional." *O'Donnell v. United States,* 891 F.2d 1079, 1083 (3d Cir.1989).

### II. Preliminary Injunction vs. Permanent Injunction

Before proceeding to make findings of fact and conclusions of law, the Court will first clarify the procedural posture of this case. At plaintiffs' request, the parties met in chambers on February 16, 1996 to discuss plaintiffs' application for a temporary restraining order. At the Court's urging, the parties, outside the Judge's presence, engaged in lengthy negotiations and eventually arrived at the following stipulation, thus eliminating the need for the Court to rule on Plaintiffs' request for a temporary restraining order:

> Defendants, their agents and those acting in concert with them will not until 5:00 p.m. on February 29, 1996 (subject to either party's application or further agreement of the parties):
>
> (1) follow the children and grandchildren of Leonard Abramson;
>
> (2) go to the homes or schools of the children or grandchildren of Leonard Abramson; or
>
> (3) broadcast any likeness or photographs of the grandchildren of Leonard Abramson, or use any such likenesses or photographs for any purposes.

In a note attached the above stipulation, the parties stated: "The Judge is requested *not* to sign this stipulation but to be sure that it is filed...." Also on the February 16, 1996, the Court, with the parties' consent, entered an order pursuant to Fed.R.Civ.Proc. 65(a)(2) advancing and consolidating plaintiffs' application for a preliminary injunction with the trial on the merits. The Court ordered the consolidation based on its understanding that the plaintiffs were primarily concerned with obtaining preliminary and permanent injunctive relief. After the Court was made aware that both plaintiffs and defendants had demanded a jury trial, the Court considered that portion of Rule 65(a)(2) which provides:

> This subdivision shall be so construed and applied as to save to the parties any rights they may have to trial by jury.

After reviewing several cases including *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); and *Perez–Serrano v. DeLeon–Velez,* 868 F.2d 30 (1st Cir.1989), it became apparent that by making findings of fact and conclusions of law in connection with plaintiffs' request for a permanent in-

junction, this Court might well be depriving the parties of their 7th Amendment right to a trial by jury. The Court has therefore determined to limit its findings to plaintiffs' request for a preliminary injunction.

■ In ruling on a motion for a preliminary injunction, the district court must consider (1) the likelihood that the plaintiff will prevail on the merits at trial; (2) the extent to which the plaintiffs will suffer irreparable harm in the absence of an injunction; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary injunctive relief. *Merchant & Evans v. Roosevelt Bldg. Products,* 963 F.2d 628, 632–633 (3d Cir.1992); *Opticians Ass'n v. Independence Opticians,* 920 F.2d 187, 191–92 (3d Cir.1990).

### III. Findings of Fact and Conclusions of Law Re: Likelihood of Success on the Merits

■ Plaintiff Richard Wolfson is the son-in-law of Leonard Abramson, the chairman of the board and principal executive officer of U.S. Healthcare. Mr. Wolfson is director of pharmacy and dental operations at U.S. Healthcare. He supervises thirty employees. Nancy Wolfson, Leonard Abramson's daughter, is director of the health education department at U.S. Healthcare. In this position, she administers the preventive healthcare programs for members of U.S. Healthcare. U.S. Healthcare classifies Nancy and Richard Wolfson as operations and administration officers. According to U.S. Healthcare's 1994 Annual Report, there are 160 officers in the company including the Wolfsons and Leonard Abramson. Non-party Marcy Shoemaker is Nancy Wolfson's sister and the president of a video post-production company called Criterion. U.S. Healthcare owns 51 percent of Criterion Communications.

The Wolfsons live in an attractive single-family home in Gwynedd Valley, Pennsylvania, a short distance from U.S. Healthcare's corporate headquarters in Blue Bell, Pennsylvania. They have a three year old daughter and a one year old son. At the time of the events hereinafter described, Mrs. Wolfson was pregnant with the couple's third child. Mr. and Mrs. Wolfson endeavor to live a quiet life with their children.

Paul Lewis and Steve Wilson are award-winning journalists who work for the syndicated television news program *Inside Edition. Inside Edition* is produced by Inside Edition, Inc. *Inside Edition* is distributed to a nationwide television audience by King World Productions. Stephen Wilson resides in Florida, and Paul Lewis resides in Massachusetts.

Mr. Wilson has been an investigative journalist and correspondent with *Inside Edition* for five years, and a professional journalist for twenty-six years. As correspondent, Mr. Wilson conducts interviews and provides on-screen narration for *Inside Edition* broadcasts. Mr. Wilson was in charge of the investigation of the story on U.S. Healthcare. Paul Lewis has been an investigative producer for *Inside Edition* for approximately one and a half years and a professional journalist for approximately eighteen years. Non-party Bob Read is the senior producer in charge of *Inside Edition*'s investigative reporting unit. Mr. Read supervises Mr. Wilson and Mr. Lewis. Non-party Michael Tracey is the freelance cameraman and non-party Richard Robinson the freelance sound recordist *Inside Edition* hired to assist Mr. Wilson and Mr. Tracey with the U.S. Healthcare story. Non-party John Weitzman is the freelance cameraman who worked for Mr. Lewis and Mr. Wilson in Florida during the weekend of February 17, 1996.

*Inside Edition* has no written guidelines governing reporters' conduct in the field when investigating a story. *Inside Edition* journalists investigating a story are expected to conduct themselves in a lawful manner, but the newsgathering approach to each story is discussed on a case by case basis.

The events underlying this lawsuit occurred between February 11–18, 1996. Sometime prior to the events hereinafter described, Leonard Abramson received anonymous threats targeted at himself and his

family. Although there was no direct testimony concerning the specific nature of these threats, they apparently raised serious concerns on the part of U.S. Healthcare about the safety of Mr. Abramson and his family. U.S. Healthcare responded to these threats by implementing strict security measures which included hiring full-time security personnel to protect Mr. and Mrs. Abramson, their children, and their grandchildren. Former Assistant Deputy Director for the FBI, William Gavin, is the head of security at U.S. Healthcare. Robert Gerken, a twenty-five year veteran of the Pennsylvania State Police with extensive training and experience in executive security, was assigned to protect the Wolfson family. Another security guard, Mr. Pickersgill, was also assigned to protect the Wolfson family.

Mr. Lewis, the producer of the story about executive salaries at U.S. Healthcare, arrived in Pennsylvania at around 6 p.m. on February 11, 1996 to begin preliminary work on the story. He rented a white Chrysler at the Philadelphia Airport and drove around checking out the offices of U.S. Health Care in Blue Bell and the home of Mr. Abramson.

At about daybreak on February 12, 1996, Mr. Lewis parked his rented white Chrysler on the shoulder of a public road approximately 100 yards from the electronic gate to surveil Mr. Abramson's home. Sometime that morning, Mr. Lewis discovered that he was being followed by security personnel from U.S. Healthcare and made a quick maneuver while driving to avoid detection. To insure that he would not be recognized later, he traded in the rented white Chrysler for a Jeep Cherokee on the afternoon of the 12th when he met Mr. Wilson at the Philadelphia Airport.

On or about January 29, 1996, Mr. Lewis, on Mr. Wilson's behalf, faxed Mr. Abramson a letter requesting an on-camera interview regarding salaries paid to executives at U.S. Healthcare. Mr. Abramson did not respond to this request. Prior to his arrival in Pennsylvania on February 11, 1996, Mr. Lewis faxed the identical written request for an on-camera interview to Mr. Abramson on two more occasions. Mr. Abramson never responded.

Mr. Wilson made one last attempt to obtain an on-camera interview with Mr. Abramson on February 12, 1996 after he arrived in Pennsylvania. He called Mr. Abramson's office and was referred to U.S. Healthcare's public relations firm. Public relations strongly indicated on February 12, 1996 and informed Mr. Wilson definitively on February 13, 1996 that neither Mr. Abramson nor any other executive at U.S. Healthcare would be interested in providing an on-camera interview to *Inside Edition.*

Mr. Wilson and Mr. Lewis learned from a confidential source that Mr. Abramson intended to leave for Florida on February 13, 1996. On the morning of the 13th, Mr. Wilson, Mr. Lewis and their camera and sound crew went to Atlantic Aviation and from a van stationed outside the tarmac surreptitiously videotaped Mr. Abramson and Mrs. Abramson boarding a corporate jet. To conceal their activities, they hung an opaque, black cloth know as duvetyn over the windows of the van.

After their requests for an on-camera interview with Mr. Abramson had been firmly rejected, and after learning that Mr. Abramson would be departing on February 13, 1996 for Florida, Mr. Wilson and Mr. Lewis turned their full and undivided attention to Mr. and Mrs. Wolfson and Marcy Shoemaker. At no time did either Mr. Lewis or Mr. Wilson ever request an interview with Mr. or Mrs. Wolfson. Mr. Wilson and Mr. Lewis had obtained information concerning Mr. Wolfson's and Mrs. Wolfson's positions at U.S. Healthcare, their salaries, their home address, and the types of cars they drove.

On February 12, 1996, when they were almost certain that Mr. Abramson would not provide an on-camera interview, Mr. Lewis and Mr. Wilson developed and began to implement a plan to engage in surreptitious surveillance of the Wolfsons. On February 12, 1996, Mr. Lewis called the *Inside Edition* crew coordinator in New York City to arrange for a cameraman and sound technician to begin work on February 13, 1996. In accordance with *Inside Edition* policy, a "One Interview Only Shoot" form was completed at the *Inside Edition* office in New

York City documenting Mr. Lewis's request for a crew. This form clearly sets forth that Mr. Lewis needed a van with tinted windows and camera and sound crew for an "ambush."

As described by Mr. Wilson, Mr. Lewis and by their expert witness Robert Greene, a two-time Pulitzer prize winning journalist, an "ambush interview" refers to a confrontational, surprise interview with an unwilling subject, generally a person who has previously refused to be interviewed. The T.V. journalist approaches the subject surreptitiously with cameras and sound rolling and asks a question calculated to embarrass the subject. Webster's Third New International Dictionary defines the verb "ambush" as (1) to station in ambush; (2) to lie in wait and attack by surprise. Mr. Wilson and Mr. Lewis requested a cameraman and a sound recordist for the purpose of ambushing Mr. and Mrs. Wolfson.

After filming Mr. and Mrs. Abramson leaving for Florida on February 13, 1996, Mr. Wilson and Mr. Lewis implemented the early stages of their plan to ambush Mr. and Mrs. Wolfson. Mr. Wilson and Mr. Lewis drove by the home of Mr. and Mrs. Wolfson on February 13, 1996. Later they went to the parking lot of U.S. Healthcare where they identified Mr. Wolfson's car and laid in wait for him to emerge from the building. They did surreptitiously obtain footage of Mr. Wolfson leaving U.S. Healthcare on February 13, 1996.

At the crack of dawn on February 14, 1996, Mr. Wilson, Mr. Lewis, Mr. Tracey and Mr. Robinson met at the Fort Washington Holiday Inn. Mr. Tracey brought his betacam camera which has a camera mounted recorder. Mr. Robinson had a Shore Brothers FP–32A audio mixer, a Sennheiser MKH60 unidirectional microphone (a "shotgun microphone"), and a fish pole or microphone boom. As plaintiffs' audio expert, Bruce Koenig, testified, "shotgun mikes" are capable of recording conversations and sounds taking place at a distance of about sixty yards. The purpose of the "shotgun mike" is to pick up narrow as opposed to broad sound patterns.

At about daybreak on February 14, 1996, Mr. Lewis surreptitiously parked his rented Jeep in a neighbor's driveway across the road and approximately 40–50 yards up the road from the Wolfsons' home. Because the neighbor's house where he parked the Jeep was for sale, Mr. Lewis believed that he was not required to obtain permission to park there.

Meanwhile, Mr. Wilson, Mr. Tracey and Mr. Robinson were stationed in a parking lot a short distance from U.S. Healthcare's executive offices in Mr. Tracey's 1996 blue Chevrolet Astrovan. They had once again draped duvetyn over the windows to conceal the camera and sound equipment they had placed in the back of the van.

Richard Wolfson was driven to work by one of the family's security guards sometime around 7:30 a.m. Mr. Lewis followed the car in which Mr. Wolfson was riding with the security guard to U.S. Healthcare and, using his cellular phone, called Mr. Wilson, Mr. Tracey, and Mr. Robinson to report that Mr. Wolfson was on his way to work. As the car containing Mr. Wolfson pulled into the parking lot of U.S. Healthcare, Mr. Wilson immediately turned in behind him. Mr. Wolfson was dropped off at the front entrance to U.S. Healthcare. Mr. Wilson positioned the van along the curb near the entrance of the building and in front of the car containing Mr. Wolfson, and Mr. Tracey filmed him as he exited the passenger side of the car and walked up the stairs to enter the U.S. Healthcare building. Mr. Wolfson did not know he had been followed to work, nor did he know that he had been photographed for the second time. Afterwards, Mr. Wilson and the crew left the U.S. Healthcare parking lot, and Mr. Lewis returned to the neighbor's driveway to await Mrs. Wolfson's departure from her home.

At approximately 8 a.m. on February 14, 1996, Mr. Gerken, one of the Wolfsons' security guards, became suspicious when he observed a Jeep he had never seen before backed into a neighbor's driveway with its nose flush with the road. Mr. Gerken was aware that on February 12, 1996 a suspicious white Chrysler had been detected in the vicinity of Mr. Abramson's home. Mr. Gerken's concern was heightened because he

could not see the license plate and because the Jeep's tinted windows prevented him from determining whether it contained occupants other than the operator. He immediately reported the suspicious Jeep to security guard Mr. Pickersgill and Mrs. Wolfson, neither of whom recognized the Jeep. Mrs. Wolfson became alarmed.

Shortly thereafter, Mr. Pickersgill departed the Wolfsons' home to take their three year old daughter to nursery school. Mr. Gerken followed them. As Mr. Pickersgill made a left turn out of the Wolfsons' driveway, Mr. Lewis simultaneously made a left turn out of the driveway where he was attempting to hide. The cars passed on the road, and Mr. Lewis, driving very slowly, peered conspicuously into the car containing the Wolfsons' young child. Upon observing Mr. Lewis's actions, Mr. Gerken became even more worried that this suspicious vehicle posed a threat to the Wolfsons and their children. He concluded "that the person was very concerned about that particular vehicle and the occupants of the vehicle, and it caused me concern."

Mrs. Wolfson delayed her departure for work until the security guard returned from dropping her daughter off at school. Alarmed that her exceptionally well-trained and experienced security guards believed that the Jeep had attempted to follow her daughter to school, Mrs. Wolfson became extremely anxious about the welfare of her children, her husband and herself. The security guards obtained the Jeep's license plate. Although it was not his customary practice, after the encounter with the suspicious Jeep, Mr. Gerken decided to return to the Wolfsons' residence after following their daughter to school. He also decided to follow Mrs. Wolfson to work.

Mrs. Wolfson turned out of the circular driveway in front of her home, and she was immediately followed by Mr. Gerken. As soon as they departed the driveway, Mr. Lewis pulled in behind Mr. Gerken. Mr. Lewis alerted Mr. Wilson that Mrs. Wolfson was on her way to work and that she was being followed by another vehicle. Mr. Lewis followed Mrs. Wolfson and Mr. Gerken until they neared U.S. Healthcare. He then proceeded to a lot down the street from U.S. Healthcare to await the return of Mr. Wilson, Mr. Tracey and Mr. Robinson.

While following Mrs. Wolfson to work, Mr. Gerken believed that Mrs. Wolfson's life might be in danger. His concern was so great that he removed his "semi-automatic" weapon from underneath the seat of his car and placed it in his lap, something he had not done in the three years since leaving the Pennsylvania State Police. He felt that the threat was immediate. He testified that the situation,

> could have developed in a matter of seconds. If we had passed an intersection and been intercepted by one or more other vehicles which were also involved with this vehicle behind me, obviously in a matter of seconds a life could have been taken.

Realizing she was being followed, Mrs. Wolfson was visibly shaken, and Mr. Gerken was afraid she was going to run off the road. She testified:

> I got in my car and as soon as I pulled out of my driveway, I realized that this purple jeep, or jeep was following me. And I have a relatively short ride to work so at this point, I mean, I was panicked. I really felt that the family must have been being set up for kidnapping or murder or something because now there is two attempts to follow. It wasn't just coincidental, now it was definite.

As she drove to work, she used her cellular phone to contact William Gavin, the head of security at U.S. Healthcare. She instructed him to send someone to check on her one year old son at home and informed him that she would direct Mr. Gerken to return to her daughter's school to make sure she was safe. While this was going on, Mr. Lewis remained in constant communication with Mr. Wilson and alerted him that Mrs. Wolfson would soon be arriving at U.S. Healthcare.

As Mrs. Wolfson pulled into the parking lot, Mr. Wilson immediately pulled in behind her. Mr. Wilson again pulled along the curb near the entrance to U.S. Healthcare. Mrs. Wolfson got out of her car, instructed Mr. Gerken to return to her daughter's school, and ran into the building. Mr. Wilson's hope

was that they could capture Mrs. Wolfson on film as she passed behind the van. Instead, she went in front of the van, and Mr. Tracey was unable to videotape her. A little while later, Mr. Wilson and the crew met up with Mr. Lewis.

As soon Mrs. Wolfson arrived at work, she summoned her husband from a meeting, and called her daughter's school to alert them that her daughter may be in danger. Mr. Sebastianelli, the co-president of U.S. Healthcare and Mrs. Wolfson's supervisor, observed that she was very fearful, trembling and ashen white. Her husband described her demeanor as "close to tears, visibly upset, very distraught."

Mr. Wolfson testified that he too was very upset upon learning that an attempt had been made to follow his daughter to school and that his wife had been followed to work that morning. He immediately left work accompanied by Mr. Gavin to check on his daughter. Although relieved that no harm had yet come to her, Mr. Gerken remained stationed at the school.

A little while later, the Wolfsons and U.S. Healthcare learned that the suspicious Jeep that had followed Mrs. Wolfson to work and was suspected of following the Wolfsons' daughter to school had been rented at the airport to Paul Lewis of King World productions. U.S. Healthcare's public relations firm spoke to Mr. Read about Mrs. Wolfson's fears that her child was in danger and the fact that she had been followed to work. Mr. Read advised U.S. Healthcare that *Inside Edition* had T.V. journalists on location in Pennsylvania preparing a story on salaries paid to executives at U.S. Healthcare.

Mr. Read spoke to Mr. Wilson and Mr. Lewis in the van to discuss the allegation that they had followed a child that morning. After this conversation, Mr. Wilson called Mrs. Wolfson, identified himself as an investigative reporter for *Inside Edition* and made an attempt to assure her that he intended no harm to her children. Mrs. Wolfson testified that she thought it was a "threatening phone call" because he referred to her two children.

Mr. Sebastianelli and Mr. Read spoke sometime in the early afternoon. Mr. Sebastianelli explained to Mr. Read that Mrs. Wolfson was extremely afraid. He testified:

> I insisted that they stop. I asked him whether he had any children. He said that he had an 11–month old child. I asked him to place himself in the shoes of Mr. and Mrs. Wolfson and how he would feel if his wife had their 11–month old child in a car seat next to her and was being followed around and had reason to fear for their safety.

Mr. Read stated that he did not believe that his reporters had followed a child but would investigate the matter further. He explained that Mr. Abramson had previously declined to give an on-camera interview. Mr. Read asked Mr. Sebastianelli whether Mr. Abramson would be willing to provide a statement or an interview.

Sometime in the early afternoon, Mr. Wolfson returned to pick up his daughter from nursery school. Mr. Gerken, who had been stationed at the school, followed Mr. Wolfson home. Mr. Wolfson's distress over the events of the morning was so severe that he pulled over and asked Mr. Gerken to proceed ahead to make sure that it was safe to bring his daughter home.

Only three or four minutes after pulling into his driveway, Mr. Wolfson looked outside and was shocked to see the duvetyn draped van parked directly across the street from his home. The van contained Mr. Wilson, Mr. Lewis, Mr. Tracey and Mr. Robinson who, despite being aware of the Wolfsons' fear and terror for the safety of their children, had arrived to videotape the Wolfsons' home without informing anyone, including Mr. Read. They had taken no precautions to ascertain whether there would be children in the home—which there were. Upon observing the van, Mr. Wolfson closed all the drapes throughout his home in an effort to protect his family. The Wolfson children were sequestered in the play room where they could not be seen from the road.

The Wolfson home sits relatively close to the road. There is a circular macadam driveway in front of their home which extends out to the road. Both entrances to the

driveway are marked by two stone columns, which sit several feet from the road. There are no sidewalks along the road.

After dropping Mr. Wolfson and his daughter off at the home, Mr. Gerken proceeded a short ways in the direction of U.S. Healthcare. He then observed Mr. Tracey's blue van driving toward the Wolfsons' home. Mr. Gerken immediately made a U-turn and returned to the Wolfsons' home. He parked his vehicle in the middle of the road approximately fifteen feet from Mr. Tracey's van, and watched as Mr. Tracey prepared to videotape the Wolfsons' home. Mr. Tracey, Mr. Wilson and Mr. Robinson then walked about four feet into the Wolfsons' driveway. At this point, Mr. Gerken drove his van onto the portion of the Wolfsons' driveway where Mr. Wilson, Mr. Tracey, and Mr. Robinson stood and informed them that they were trespassing. Mr. Wilson responded that he had a "ten foot easement" and that if Mr. Gerken had a problem with that he should call the police. Neither Mr. Wilson, Mr. Tracey nor Mr. Robinson informed Mr. Gerken that they were from *Inside Edition*. Mr. Gerken described their behavior as "very cocky". Their conduct suggested to him that they believed "they had more right to be there than I did, and I wasn't going to tell them anything."

Rather than argue with them, Mr. Gerken blocked the camera. In response, Mr. Gerken testified that one responded: "You are going to have to be a lot bigger than that, pal, to block out that house." Their demeanor was sufficiently aggressive and belligerent that Mr. Gerken was concerned that there might be a physical confrontation and that he was in "an awkward situation" with three of them and the driver of the van. Because he felt that it might be necessary to identify these men later, he got a camera and took their pictures.

During the course of filming the Wolfsons' home, Mr. Wilson became very upset with Mr. Robinson when he discovered that the sound was not turned on. Mr. Wilson instructed Mr. Robinson that he wanted sound "every inch of tape we shoot." Soon after this exchange between Mr. Robinson and Mr. Wilson, they loaded their equipment into the

van and left the Wolfsons' home and drove in the direction of U.S. Healthcare. They were at the Wolfsons' home for approximately fifteen minutes.

After the *Inside Edition* crew left, Mr. Wolfson returned to work. He left strict instructions with security to keep his children away from open windows and doors and to keep all the shades drawn.

A little while later, Mr. Read and Mr. Sebastianelli spoke again. Mr. Sebastianelli again described the family's fear for the safety and security of their children and implored Mr. Read to put a stop to his reporters' activities in Pennsylvania. Mr. Read defended his reporters' actions as within the bounds of legal newsgathering and again denied that they had followed the Wolfsons' daughter to school. He reiterated his request that Mr. Abramson provide an on-camera interview for the story. In this conversation Mr. Sebastianelli informed Mr. Read that Mrs. Wolfson was pregnant. Mr. Wilson and Mr. Lewis received another call from Mr. Read telling them that Mrs. Wolfson was pregnant. At no time on February 14, 1996, did Mr. Read do anything to curtail the conduct of Mr. Wilson and Mr. Lewis.

After videotaping the Wolfsons' residence, Mr. Wilson, Mr. Lewis, Mr. Tracey and Mr. Robinson filmed the exterior of Mr. Abramson's home and then proceeded to nearby Bryn Mawr, Pennsylvania to videotape Marcy Shoemaker's home. Also in the afternoon of February 14, Mr. Wilson, Mr. Lewis and the crew went to Criterion to try to get an interview with Marcy Shoemaker. They barged into the building with the cameras rolling and, after being advised that Mrs. Shoemaker would not participate in an interview, left at the request of the security guard.

To escape what they perceived to be a danger to themselves and their children, Mr. and Mrs. Wolfson hurriedly made plans to go to Florida and spend a few days with Mr. and Mrs. Abramson at the "Abramson family home". Mr. Wolfson felt it imperative to the well-being of his family to "go to some other place where we believed we would not be followed or terrorized." Mr. and Mrs. Wolf-

son departed with their children from their home in Gwynedd Valley in the afternoon of the 14th, and arrived in Florida that evening.

The "Abramson family home" in Florida is one of several large homes in an exclusive community called Admiral's Cove located on the Intracoastal Waterway in Jupiter, Florida. The Intracoastal Waterway, a public boating "highway", is a north/south water route that runs the length of Florida. The back of the Abramson family home faces the Intracoastal Waterway. · The front of the home faces the interior of Admiral's Cove. Boaters are not permitted to cross a rope that divides the Abramson family home from the public waterway. Visitors must be cleared by security at the entrance of Admiral's Cove. In addition to the security provided at the entrance to Admiral's Cove, on February 17 and 18, 1996, Elite Protection Services, a private security company, had assigned two guards to protect the Abramson family.

Mr. Wilson and Mr. Lewis arrived in Florida on February 16, 1996, the day their attorneys entered into the stipulation heretofore quoted. In this stipulation, Mr. Wilson and Mr. Lewis agreed that they would not follow the children or grandchildren of Leonard Abramson and that they would not go to their homes or schools. Early on February 17, 1996, Mr. Wilson and Mr. Lewis cruised the Intracoastal Waterway on a boat and surveilled the area surrounding the Abramson family home, which was occupied by Mr. and Mrs. Wolfson and their children. At no time did Mr. Wilson and Mr. Lewis ascertain whether there were children in the Abramson family home.

Between 8:00 a.m. and 8:30 a.m. on February 18, 1996, a bright and sunny day, Mr. Wilson, Mr. Lewis, a cameraman and a sound technician anchored their rented motor boat a few feet from the rope which separates the public waterway from the Abramson family home. The boat was approximately 50 to 60 yards from the Abramson family home. The drapes to the Abramson family home were drawn when they arrived. Although it is common for recreational boats to take excursions on the Intracoastal Waterway, it is unusual for a boat to anchor so close to private property.

On board was a Sennheiser "shotgun mike", a television camera equipped with zoom lenses and a mounted microphone, a sound mixer, headsets, and binoculars. The "shotgun mike" was attached to a long stick called a "boom" and was covered by a "wind screen". As the name suggests, the wind screen protects the mike from wind blowing across its surface and interfering with its ability to pick up sound at a distance. Although the "shotgun mike" itself is approximately twelve inches long, the entire apparatus including the wind screen and boom is several feet in length.

As heretofore pointed out, a "shotgun mike" is designed to isolate certain sounds or conversations taking place at a distance. A "shotgun mike" can pick up sound from a certain direction by reducing peripheral noise. The plaintiffs' expert, Bruce Koenig, who for twenty-one years was the FBI's special agent in charge of the audio and video processing group, testified that the "shotgun mike" used by Mr. Lewis and Mr. Wilson in Florida was capable of picking up conversations up to sixty yards away. The expert testified that no microphone could pick up conversations through a closed door or closed windows. He did testify, however, that the "shotgun mike" Mr. Wilson and Mr. Lewis used would be capable of picking up conversations occurring approximately sixty yards away of people inside a home standing relatively close to an open window or door.

Upon observing the boat anchored suspiciously close to the property line of the Abramson family home, the Elite Security guards became extremely concerned that the Abramson family was in danger. Security guard Mr. Harry DePaul advised his partner, Mr. William Sopczak, to "take some cover" so he would be protected if "there was some gunplay or anything of that nature."

Security guard Harry DePaul informed the occupants of the Abramson family home that there was a suspicious boat anchored right outside the rope with microphones, cameras and video equipment. Mr. DePaul described the occupants' fearful reaction to the news

that there was a boat anchored in front of the Abramson family home:

> Initially I spoke with Mrs. Abramson. She seemed visibly upset, nervous; and I then spoke with Mr. Abramson and advised him that yes, in fact there were individuals out behind the house, in the inlet. I advised him they should keep the children and themselves away from the windows and someplace safe together. The children were shaken. Mothers were—a few of the mothers—I can't give you their names because I don't know them that well—were holding their children tightly; and most of them remained upstairs huddled together tightly.

Mr. DePaul instructed the family to stay away from windows to protect them in the case of "gunplay." As he put it:

> The whole back of the house is nothing but windows. There was no obstructions if there was some shells or anything to penetrate those windows to stop them from hitting anyone.

Upon learning about the boat, Mrs. Wolfson took her children upstairs to the second floor so they could not see what was going on and would not be visible to the outside. Mr. Wolfson was out playing golf. Mrs. Wolfson checked to make certain that all the curtains were drawn so that her children could not be seen from the outside. Her primary goal was to keep her children busy so "they wouldn't see, and just try and divert their attention as much as possible." Her response to the news was one of fear and outrage:

> I basically was outraged; that we tried to get away, we tried to live a normal life, we tried to just maintain some kind of, again, normalcy for our kids and here we take them away and they are following us. We just couldn't hide, we couldn't get away from anything, and it was horrible because it was a beautiful day and kids want to go outside and play. We couldn't take them out to the swimming pool or let them play in the playground because that was all outside in the back of the house where these people were.

Mr. Wilson, Mr. Lewis and their crew remained anchored in front of the Abramson family home for several hours. For most of that period, the video camera and shotgun mike were aimed at the Abramson family home. Everyone in the boat was well-aware that the two men standing on the dock were security guards, and they used binoculars and video equipment to observe them. Mr. Wilson stated: "They got the security guys. I want the one in the blue sweater". Using binoculars or a zoom lens, Mr. Wilson was able to see one of the security guard's badges: "The guy on the radio [is] a cop. He's got a badge."

As the following conversation recorded by the "shotgun mike" reveals, even though it was apparent from the drawn drapes that the occupants of the Abramson family home desired privacy, Mr. Wilson and Mr. Lewis did not limit their observations to security's activities on the dock but used binoculars and video cameras in an attempt to observe members of the family at windows in the Abramson family home:

> —That's him right there. Bedroom door, far right. See him?
>
> —You sure?
>
> —Blue shirt.
>
> —All I see is a . . . (unintelligible)
>
> —See what we're talking about
>
> —The door
>
> —The white door on the other side now.
>
> —On the right side of the house.
>
> —See that door on the right side . . . on the far right
>
> —Well, I got a great look at it.
>
> —Pull up—now he's on the other side, see him?
>
> —All I see is . . .
>
> —Pan that shot.
>
> —Binoculars
>
> —He's also got a badge on his belt.
>
> —Yes he does.
>
> —sh, sh.
>
> —He's staring out the window.
>
> —Yeah, I see her. Are you watching her?
>
> —They think this thing can hear every whisper.
>
> — . . . a big boom.

—Yeah. (laugh)

—Look at him peaking out the window again, John. See him over there?

—Did you get the drapes closing then just now?

—Yep.

—Good.

Likewise, the following conversation, also recorded by the "shotgun mike", reveals that Mr. Wilson and Mr. Lewis were attempting to view activities going on inside the Abramson family home:

—There's the guy who slid by.

—Yeah, see if this is him.

—The picture window.

—Yeah, I see it now. Shoot it. You got it?

—Yeah. A little bit rocky, but . . .

—He's wearing pajamas.

—Well he may be our man.

—Yeah.

—Get it?

—Stay on him.

—Shoot him, John.

The video footage that accompanies the above dialogue shows a man with binoculars peering between barely ajar drapes.

The "shotgun mike" also picked up and recorded the following three portions of conversations of the security guards:

(1) We got a boat in the area, boat here . . .;

(2) Right on the other side of the rope;

(3) I got em. 7–10 . . . I got . . . We got a boat over here . . . Right on the other side . . . I got them.

Mr. Wilson and Mr. Lewis became aware during the day that the occupants of the Abramson family home, as well as the community, found their conduct suspicious. Three times during the day, they were questioned about their activities by security and police. Soon after they anchored outside the Abramson family home, one of the Elite security guards radioed security for Admiral's Cove to investigate why the boat was anchored so close to the Abramson family home. When the Admiral's Cove security arrived, the following conversation was recorded:

From Boat: Shoot this conversation we're going to have here in a minute. Do you want the hand mike?

From Boat: No, pick it up with the boom, but follow me. I want sound of both sides. The guy with the baseball cap. No! out on the water.

From Boat: You see that boat coming at us. Sorry. In fact why don't you stand up right here where I am and I'll stand up right here and you'll be able to . . .

Security: How you guys doing?

From Boat: We're great. How are you doing this morning?

Security: Good. You can't video on inside the cove—private property.

From Boat: I'm not inside the cove. I'm on public property here.

Security: Very well. Don't go inside.

From Boat: Oh, you know we wouldn't do that.

After conferring with the Elite security guards, the Admiral's Cove security returned a few minutes later:

Security: The resident would like to know who you are.

From Boat: Tell the resident we're, ah, tourists.

Security: Okay.

Later, Mr. Wilson and Mr. Lewis were approached by a deputy sheriff marine patrol from Palm Beach County and the following conversation was recorded:

Police: We got a call. Someone complained about you guys videotaping, suspicious. We talked to the guys over at Club Nautico at Jupiter Marina and they said you guys were from one of the, some show. I don't know what show it is. I guess you could lead me on about that a little more?

From Boat: What do you want to know?

Police: Well, basically, what you all are doing in here videotaping.

From Boat: We're doing a story about the man who lives in that house.

Police: Okay.

From Boat: That's what he basically what he told you.

Police: No problem. I don't have a problem with you videotaping. I guess, I don't know if one of their security or one of the people called in and complained but I don't know. We thought that maybe people were videotaping boats and were going to come back and break into some of them.

From Boat: No, no we are a television news crew and we are not here for any illegal purpose. We have been told and, of course we'll stay out of the area that's marked no trespassing. Otherwise, our intentions are to spend a day and soak up some sun and keep an eye on the place.

Police: Okay, not a problem.

From Boat: All right.

Police: You guys can do what you want. All right. You all have a good one. No problem.

From Boat: Thanks, you too.

Sometime late in the morning or early afternoon, Mr. Wilson and Mr. Lewis abandoned their surveillance of the Abramson family home and set up cameras on the highway at the entrance to Admiral's Cove. It was there that they had a third encounter with the local police. They later continued their surveillance of the Abramson family home from the Intracoastal Waterway.

As a result of the videotaping and recording with the "shotgun mike", the Wolfsons were prisoners in the Abramson family home. As heretofore set forth, Mrs. Wolfson could not take her children out to play in the back yard because the boat was anchored there. As she testified: "I felt like a prisoner in my own house. I couldn't go outside. I couldn't leave the house, the kids couldn't go outside." When Mr. Wolfson returned from playing golf he found his family "huddled in the living room with all the windows to the back drawn." To make matters worse, soon after his return, the occupants of the Abramson family home learned that there was a T.V. crew stationed at the entrance to Admiral's Cove. Concerned that Mr. Wilson and Mr. Lewis might gain access to Admiral's Cove, Mr. Wolfson made sure that all of the curtains were drawn in the front of the house. After security reassured the Wolfsons sometime later in the day that the front of the home was safe from Mr. Wilson and Mr. Lewis, the Wolfson children, who had been cooped up inside for much of the day, were finally permitted to play in an enclosed area in front of the Abramson family home.

Although the evidence is not clear as to exactly when Mr. Lewis and Mr. Wilson learned that the Abramson family had received threats, the following conversation on the boat clearly shows that on the 18th of February, 1996, they were well aware of the Abramson family's security concerns:

—He's scared

—According to, uh, if you believe their story about death threats or kidnapping ... which may well be true, I wouldn't yeah ... I believe that it's probably true. I mean, if one of your kiddies under the care of his company, I can imagine somebody would be wacko enough to pick up the phone and say you son-of-a-bitch, you ...

There were no other incidents in Florida prior to the Wolfsons' departure on Tuesday, February 20, 1996. But as a result of Mr. Wilson's and Mr. Lewis's activities, the plaintiffs had to be surreptitiously lead away by security guards from the Abramson family home at Admiral's Cove on Tuesday, February 20, 1996. There was a specific concern that an attempt would be made to ambush them while en route to the airport. In fact, Mr. Wilson and Mr. Lewis were in the vicinity of the West Palm Beach Airport on February 20, 1996. Security guards drove the Wolfsons and the Abramsons through a back entrance to Admiral's Cove. They loaded the plane in the hangar and pulled down all of the shades to avoid being ambushed.

The heretofore described activities of Mr. Wilson and Mr. Lewis have altered the Wolfsons' physical and emotional sense of seclusion. Mrs. Wolfson testified:

I still feel that I can't live a normal life.... I am beginning to just have to live looking over my shoulder. I haven't been able to take my kids anywhere, basically. I mean Sunday was a beautiful day and we stayed in the house most of the

day. I mean, I couldn't let them go outside and play because I didn't know who would be outside my house. So the fear and the panic has not gone away.

Mr. Wolfson testified:

This has completely changed the way we now run our lives. We still have all of the blinds closed in the house, we keep the—we continue to keep the kids away from the windows, we continue—we cannot, with the change in the weather we recently had, we cannot take them out. They have taken away our freedom.

The Wolfsons also testified that they have minimized their social engagements, and the emotional strain has made it difficult to concentrate on their work.

As set forth above, the Restatement (Second) of Torts defines intrusion upon seclusion as follows:

One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

The Court finds that plaintiffs have presented sufficient evidence to support a reasonable likelihood of success on the merits of their claim for invasion of privacy based on intrusion upon seclusion under Florida and Pennsylvania law. A reasonable jury could well find that Mr. Wilson and Mr. Lewis intentionally intruded, in a manner that would be highly offensive to a reasonable person, upon the solitude and seclusion of the Wolfsons by engaging in a course of conduct apparently designed to hound, harass, intimidate and frighten them. The intrusions committed by Mr. Wilson and Mr. Lewis consisted of a pattern of conduct involving physical and sensory invasions into Mr. and Mrs. Wolfson's privacy. Mr. Wilson's and Mr. Lewis's actions deprived the Wolfsons of the right to live their life quietly and peacefully.

Turning to the element of intent, this Court generally instructs juries that intent is a mental act which is difficult to prove by direct evidence. Intent is a purpose, aim or state of mind with which a person acts or fails to act. The existence of such an element may be inferred from a person's acts or conduct.

The evidence is sufficient for the Court to find that there is a reasonable likelihood that plaintiffs will succeed in convincing a jury that the conduct of Mr. Wilson and Mr. Lewis in Pennsylvania and Florida was intentional and that it was undertaken to convince Mr. Abramson that his consent to be interviewed on T.V. would bring an end to the hounding and harassment of his daughters and grandchildren, who are the objects of his affection. During his conversations with Mr. Sebastianelli, Mr. Read made it abundantly clear that *Inside Edition* was interested in obtaining an on-camera interview with Mr. Abramson. Mr. Read's insistence left the impression that in the event Mr. Abramson agreed to such an interview, Mr. and Mrs. Wolfson would be spared from further hounding and harassment.

The evidence shows that from the earliest stages of planning, Mr. Wilson and Mr. Lewis considered Leonard Abramson the primary target of their investigation. Commencing on January 29, 1996, Mr. Wilson and Mr. Lewis began sending letters to Mr. Abramson requesting an on-camera interview. On February 12 and 13, 1996, their final attempts to obtain such an interview by telephone were firmly and unequivocally rebuffed. It was then that they determined to ambush, harass and intrude on the lives of Mr. and Mrs. Wolfson and their children. Mrs. Wolfson and her husband are not public figures. They reside together with their two very young children in a quiet suburban community, and they endeavor to live a quiet, tranquil and peaceful life.

This Court finds that the evidence is also sufficient to support a likelihood that a jury could determine that Mr. Wilson and Mr. Lewis harassed and invaded the Wolfsons' privacy not, as defendants claim, for the legitimate purpose of gathering and broadcasting the news, but to try to obtain entertaining background for their T.V. expose concerning the high salaries paid to executives at U.S. Healthcare. Mr. Wilson and Mr. Lewis characterize their activities as "routine newsgathering" which is protected

by the First Amendment. As herein set forth, the right to gather the news is not absolute; the First Amendment protects routine, lawful newsgathering. A reasonable jury would likely conclude that it is difficult to understand how hounding, harassing, and ambushing the Wolfsons would advance the newsworthy goal of exposing the high salaries paid to U.S. Healthcare executives or how such conduct would advance the fundamental policies underlying the First Amendment which include providing information to "enable members of society to cope with the exigencies of their period." *See Curtis,* 388 U.S. 130, 147, 87 S.Ct. 1975, 1987, 18 L.Ed.2d 1094 (1967).

This Court's finding that there is a likelihood that a jury would find that Mr. Wilson's and Mr. Lewis's intrusive conduct was intentional is bolstered by the fact that prior to arriving in Pennsylvania Mr. Wilson and Mr. Lewis exhibited little interest in the Wolfson family. Although they were aware that Mrs. and Mr. Wolfson were both employed by U.S. Healthcare and both received substantial salaries, they never asked either Mr. or Mrs. Wolfson for an interview. Furthermore, according to its 1994 Annual Report, U.S. Healthcare has 160 corporate "officers" including the Wolfsons. No evidence was offered at the hearing showing that Mr. Wilson and Mr. Lewis ever attempted to ambush, harass, interview or photograph any of the other 157 officers of the company.

As pointed out above, the Court finds that a jury would be likely to conclude that Mr. Wilson's and Mr. Lewis's conduct intruded upon their seclusion and solitude. As heretofore set forth, a course of repeated harassment that amounts to hounding and becomes a substantial burden to a person may constitute an invasion of privacy. There is no doubt that Mr. Wilson and Mr. Lewis had a right to take a picture of plaintiffs of their home from the public highway. However, the evidence shows that in both Pennsylvania and Florida, Mr. Wilson and Mr. Lewis intruded much further into the privacy of Mr. and Mrs. Wolfson's lives than just taking pictures from the public highway of the public waterway; they undertook a course of hounding, harassing, intimidating, and fright-

ening conduct in complete and blatant disregard of the Wolfsons' "right to be let alone" to enjoy the tranquility and solitude of their home. Throughout the course of the herein described events, Mr. Wilson and Mr. Lewis demonstrated a complete lack of compassion and respect for the Wolfsons' legitimate fears for the security and safety of their family.

It is likely that a reasonable jury would conclude that the unreasonable surveilling, hounding and following of the Wolfsons in Pennsylvania literally drove them from their home in Pennsylvania. In Florida, Mr. Wilson's and Mr. Lewis's relentless surveillance, conducted with the aid of sophisticated sound and video equipment aimed directly at the home, virtually rendered Mr. and Mrs. Wolfson and their children captives in the Abramson family home. The evidence shows that in order to avoid being ambushed, harassed, filmed or recorded by Mr. Wilson and Mr. Lewis, the Wolfsons drastically altered their normal routine and restricted their own and their children's activities. By engaging in such egregious actions, Mr. Wilson and Mr. Lewis trampled upon the Wolfsons' sense of emotional solitude and well-being. The evidence shows that Mr. Wilson's and Mr. Lewis's intrusive conduct caused the Wolfsons fear and anguish. Apprehension and wariness continues to plague the Wolfsons to such a degree that they have found it difficult to resume their normal lives.

Prior to February 14, 1996, Mr. Abramson received threats of harm that raised concerns about his own safety and the safety of his children and grandchildren. On or about February 12, 1996, Mr. Lewis had observed the presence of security protecting Mr. Abramson's home. After he was detected by security guards while surveilling the area, Mr. Lewis turned in the rented white Chrysler for a Jeep Cherokee. Mr. Wilson and Mr. Lewis undertook this hounding, harassing and intrusive conduct toward the Wolfsons with knowledge that there were some concerns about the safety and security of the Abramson family.

One of the more serious intrusions upon the seclusion and solitude of Mr. and Mrs. Wolfson, especially in Florida, was Mr. Wilson's and Mr. Lewis's use of a "shotgun

mike" in an attempt to intercept and record, without consent, oral statements and conversations of the occupants of the Abramson family home. An intrusion upon seclusion can be by electronic means such as wiretapping, photography or the use of binoculars. *See* Restatement (Second) of Torts § 652B, comment b, illustrations 2, 3. Aiming the "shotgun mike" at the Abramson family home was a significant part of the harassing course of conduct in Florida which greatly intruded upon the solitude and privacy of Mr. and Mrs. Wolfson and became a substantial burden to their existence. Although Mr. and Mrs. Wolfson were not recorded, had they engaged in a private conversation on the terrace outside the Abramson family home, their conversation would have been recorded by the "shotgun mike". As heretofore pointed out, moreover, in Pennsylvania, Mr. Wilson became very upset with the sound technician, Mr. Robinson, when he learned that the recording equipment was not turned on when they were videotaping the exterior of the Wolfsons' home in Lower Gwynedd.

Both Pennsylvania and Florida have recognized a person's right to privacy in oral, wire and electronic communications by enacting statutes making it a crime to intentionally intercept, endeavor to intercept or procure any other person to intercept any wire, oral or electronic or oral communications. 18 Pa. C.S. § 5701, *et seq.*; Fla.Stat.Ann. ch. 934, *et seq.*; *Burgess v. Burgess,* 447 So.2d 220 (Fla. 1984); *Commonwealth v. McIvor,* 670 A.2d 697 (Pa.Super.1996). To further safeguard such privacy, these statutes also provide a civil cause of action to any person whose wire, oral, or electronic communication is intercepted, disclosed or used in violation of the law. Fla.Stat.Anno. ch. 934.10; 18 Pa. C.A. § 5725. The Court finds that there is a likelihood that a jury would find that Mr. Wilson's and Mr. Lewis's use of the "shotgun mike" under the circumstances outlined herein was an unreasonable intrusion upon the Wolfsons' seclusion.

Finally, the Court finds, after having considered all of the circumstances including the degree of the intrusion, the context of the intrusion, and Mr. Wilson's and Mr. Lewis's motives and objectives, *see Hill,* that a jury could find that Mr. Wilson's and Mr. Lewis's harassing, intrusive and hounding conduct would be highly offensive to a reasonable person. Reasonable people could regard Mr. Wilson's and Mr. Lewis's harassing and frightening conduct toward the Wolfsons as displaying a cavalier disregard for the right of ordinary citizens to enjoy the solitude and tranquility of their lives.

As to the Wolfsons' claim of trespass, Mr. Wilson and Mr. Lewis contend that they did not trespass at the Wolfsons' home on February 14, 1996. In support of Mr. Wilson's claim that he had a "ten foot easement", they contend that the portion of the Wolfsons' driveway where they placed their camera and sound equipment is a part of a right of way easement. This Court has not determined whether Pennsylvania law supports their contention that they had a right to enter that portion of the Wolfsons' driveway which encompasses the easement but which was not being used as a public right of way. This Court's finding of likelihood of success on the merits as to the Wolfsons' invasion of privacy claim has not been based upon a determination that Mr. Wilson and Mr. Lewis trespassed upon plaintiff's property. The Court's finding is based upon the evidence herein discussed showing that Mr. Wilson's and Mr. Lewis's harassing, hounding, frightening, and terrorizing conduct intruded upon Mr. and Mrs. Wolfson's right to be let alone.

## IV. Irreparable Harm to Plaintiffs and Defendants; The Public Interest

Having determined that the plaintiffs have shown that they are likely to succeed on the merits of their claim for invasion of privacy, the Court will now proceed to discuss the other three factors the plaintiffs are required to prove before a preliminary injunction may issue: (1) the extent to which the plaintiffs will suffer irreparable harm in the absence of an injunction; (2) the extent to which Mr. Wilson and Mr. Lewis will suffer irreparable harm if the preliminary injunction is issued; (3) and the public interest.

The plaintiffs have demonstrated that irreparable harm will result if Mr. Wilson's and Mr. Lewis's conduct is not enjoined. In light of Mrs. Wolfson's pregnan-

cy, further harassing and intrusive conduct by Mr. Wilson and Mr. Lewis could jeopardize the health and well-being of both her and her unborn child. The conduct of Mr. Wilson and Mr. Lewis should also be enjoined to avoid irreparable harm resulting from future encounters with the Wolfsons and those hired to protect them. The evidence shows that the Wolfsons' exceptionally well-trained security force was gravely concerned about Mr. Wilson's and Mr. Lewis's actions. The security guards reasonably interpreted their conduct as posing a threat to the safety and well-being of the Wolfson family. Although Mr. Gerken did not use his "semi-automatic" weapon, all parties should be grateful that no greater violence ensued.

Unless enjoined, it is unlikely that Mr. Wilson's and Mr. Lewis's invasive conduct toward the Wolfsons will cease. Mr. Wilson and Mr. Lewis presented no evidence that they will discontinue their pursuit of the Wolfsons. They are convinced that their conduct is protected by the First Amendment.

Mr. Wilson and Mr. Lewis will not be irreparably harmed by an injunction narrowly tailored to preclude them from continuing their harassing conduct toward the Wolfsons. Such an injunction will not impair Mr. Wilson's and Mr. Lewis's legal news-gathering activities for their story on the salaries paid to executives at U.S. Healthcare.

Finally, the Court has determined that the entry of a preliminary injunction is in the public interest. The public has an interest in protecting the privacy rights of its citizens. Because the Court will not enjoin Mr. Wilson's and Mr. Lewis's legal news-gathering activities and their right to broadcast their story, a preliminary injunction will not interfere with the public's right to be informed about the high executive salaries at U.S. Healthcare.

Accordingly, the plaintiffs having presented evidence showing a likelihood of success on the merits of their claim for invasion of privacy; that they will suffer irreparable harm if the Mr. Wilson's and Mr. Lewis's invasive conduct is not enjoined; that Mr. Wilson and Mr. Lewis will not suffer irreparable harm if their invasive activities are enjoined; and that an injunction is in the public interest, the Court will enter a preliminary injunction enjoining Mr. Wilson and Mr. Lewis from continuing to intrude upon the privacy of the Wolfsons.

An appropriate order follows.

### ORDER

AND NOW, this 8th Day of April, 1996, for the reasons set forth in this Court's Memorandum of April 8, 1996;

IT IS ORDERED: Defendants Stephen Wilson and Paul Lewis acting alone or in concert, combination or agreement with others, or at the direction of others *are enjoined* from engaging in conduct, with or without the use of cameras and sound equipment, which invades the privacy of Richard Wolfson, Nancy Wolfson and their children, including but not limited to actions of: harassing, hounding, following, intruding, frightening, terrorizing or ambushing Plaintiffs Richard and Nancy Wolfson or their children;

IT IS FURTHER ORDERED: This Preliminary Injunction is effective from noon on April 9, 1996 and shall remain in full force and effect until such time as the jury demanded by the parties shall return a verdict on the merits.

IT IS FURTHER ORDERED: In accordance with Rule 65(c) of the Federal Rules of Civil Procedure, this Order is conditioned upon the plaintiffs filing with the Clerk of this Court the bond of surety approved by the Clerk of this Court in the amount of ten thousand dollars ($10,000.00) for the purpose of providing security for the payment of such costs and damages as may be incurred or suffered by any party found to have been wrongfully enjoined or restrained.